United States District Court
Middle District of Florida
Orlando Division

TARA MADELINE DRURY,

      *Plaintiff,*

v.                           NO. 6:18-CV-485-ORL-37PDB

COMMISSIONER OF SOCIAL SECURITY,

      *Defendant.*

---

## Report & Recommendation[1]

This is a case under 42 U.S.C. § 405(g) to review a final decision of the Commissioner of Social Security denying Tara Drury's claim for disability insurance benefits. Drury contends the Administrative Law Judge ("ALJ") erred by failing to apply the correct legal standards in evaluating medical opinions and in rejecting Drury's fibromyalgia diagnosis. Doc. 15. The Commissioner disagrees. Doc. 20.

## I.    Administrative Process

The Social Security Administration ("SSA") uses an administrative review process a claimant ordinarily must follow to receive benefits or judicial review of a denial of benefits. *Bowen v. City of New York*, 476 U.S. 467, 471−72 (1986). A state agency acting under the Commissioner's authority makes an initial determination. 20 C.F.R. §§ 404.900−404.906. If dissatisfied with that determination, the claimant may ask for reconsideration. 20 C.F.R. §§ 404.907−404.918. If dissatisfied with the reconsideration determination, the claimant may ask for a hearing before an ALJ. 20 C.F.R. §§ 404.929−404.943. If dissatisfied with the ALJ's decision, the claimant may

---

[1]Citations are to the law in effect on April 11, 2014, when Tara Drury filed her claim. The Social Security Administration since has changed the rules regarding the evaluation of medical evidence, effective March 27, 2017. *See* 82 Fed. Reg. 5844 (Jan. 18, 2017); 82 Fed. Reg. 15132 (Mar. 27, 2017).

ask for review by the Appeals Council. 20 C.F.R. §§ 404.967−404.982. If the Appeals Council denies review, the claimant may file an action in federal district court seeking review of the ALJ's decision. 42 U.S.C. § 405(g); 20 C.F.R. § 404.981.

## II.  Framework

To obtain benefits, a claimant must demonstrate she is disabled. 20 C.F.R. § 404.1512(a). A claimant is disabled if she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A).

To decide whether a person is disabled, the SSA uses a five-step sequential process, asking whether (1) she is engaged in "substantial gainful activity,"[2] (2) she has a severe impairment or combination of impairments, (3) the impairment meets or equals the severity of anything in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, App'x 1, (4) she can perform any of her "past relevant work"[3] given her "residual functional capacity" ("RFC"),[4] and (5) there are a significant number of jobs in the national economy she can perform given her RFC, age, education, and work experience. 20 C.F.R. § 404.1520(a)(4). The claimant has the burden of persuasion through step four. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987).

---

[2]"Substantial gainful activity" is "work activity that is both substantial and gainful." 20 C.F.R. § 404.1572. "Substantial work activity is work activity that involves doing significant physical or mental activities." *Id.* "Gainful work activity" is work done "for pay or profit." *Id.* The SSA generally does not "consider activities like taking care of [oneself], household tasks, hobbies, therapy, school attendance, club activities, or social programs to be substantial gainful activity." *Id.*

[3]"Past relevant work" is "work [a claimant has] done within the past 15 years, that was substantial gainful activity, and that lasted long enough … to learn to do it." 20 C.F.R. § 404.1560.

[4]A claimant's RFC is the most she can still do despite her limitations. 20 C.F.R. § 404.1545(a)(1).

### III.    Case Overview

Drury was born in 1969. Tr. 177. She has a college degree, Tr. 41, and has worked as a child caregiver, food-service worker, office manager, compliance officer, and customer-service representative, Tr. 276. Her brief details her medical history. Doc. 15 at 2–12.

Insured to June 30, 2018, Tr. 12, 200, Drury applied for benefits on April 11, 2014, alleging she had become disabled on January 17, 2013, from fibromyalgia, arthritis, cervicalgia, chronic pain, syncope and collapse, migraines, pancytopenia, and sleep apnea, Tr. 177, 214. She worked part-time as an Uber driver after the date she alleged her disability had started. Tr. 12, 63–64.

A non-examining state agency consultant, Edmund Molis, M.D., opined on September 16, 2014, Drury can perform "light work"[5] with additional limitations: balancing frequently; performing other postural functions occasionally; no concentrated exposure to extreme heat, vibration, fumes, odors, dusts, and gases; and no work around hazards or with poor ventilation. Tr. 98–101.

Drury proceeded through the administrative process, failing at each level. This case followed. Doc. 1.

### IV.    ALJ's Decision

The ALJ conducted a hearing on December 13, 2016, Tr. 37–79, and issued a decision on March 9, 2017, Tr. 10–23.

---

[5]"Light work" involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b).

At step one, the ALJ found Drury had engaged in no substantial gainful activity from January 17, 2013 (the alleged onset date), to March 9, 2017 (the decision date). Tr. 12.

At step two, the ALJ found Drury "has the following severe impairments: a history of coronary artery disease with stent placement; a history of inflammatory polyarthropathy; a history of secondary adrenal insufficiency; a history of obesity; a history of extrinsic asthma and allergic rhinitis; a history of hypertension[;] and a history of obstructive sleep apnea." Tr. 12.

The ALJ found the record did not support a finding that Drury has fibromyalgia. Tr. 12. He explained:

> Primary care treatment notes of Hina Az[]mat, M.D. as well as treatment notes of Sanjiv Kapil, M.D. of the Florida Arthritis Center and the independent medical examination of James Shea, M.D. suggest a diagnosis of fibromyalgia (Exhibits 7F/38, 8F, 11F, 16F/3, 8, 23F, 24F and 27F). However, such a diagnosis is not supported by the totality of the medical evidence in the record.
>
> Her serologic testing is for the most part within normal limits (Exhibits 12F and 26F). The physical examinations, detailed below …, do not support this diagnosis nor is such a diagnosis supported by the criteria of the American College of Rheumatology for making such a diagnosis or the requirements of SSR 12-2p. There is no history of widespread pain in all quadrants of the body, 11 positive tender points (performed at digital palpation with an approximate force of 9 pounds) and evidence that other disorders that could cause the alleged symptoms were excluded.

Tr. 12–13.

At step three, the ALJ found Drury's impairments, individually or in combination, do not meet or medically equal the severity of any impairment in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, App'x 1. Tr. 13. He explained:

> There was no persistent inflammation or deformity of one or more weight bearing joints resulting in the inability to ambulate effectively or

one or more peripheral joints in each upper extremity resulting in the inability to perform fine and gross movements. [Drury] has not been noted to have problems with her ambulation or use of her hands. Nor was there inflammation or deformity in one or more major peripheral joints with involvement of two or more organs/body systems with one of the organs/body systems involved to at least a moderate level of severity and at least two of the constitutional symptoms or signs. In addition, [she] does not meet Listing 3.03 [addressing asthma].

Tr. 13.

After stating he had considered the entire record, the ALJ found that Drury has the RFC "to perform less than the full range of light work":

In an 8-hour day, with reasonable and customary breaks, [she] can sit for 4 hours and stand and walk for 4 hours, alternating her position between sitting and standing/walking every 15 to 30 minutes. [She] can use her upper or lower extremities for the push/pull operation of arm and hand and foot/pedal controls occasionally. [She] can lift 15 pounds occasionally and 10 pounds or less more frequently. [She] cannot climb ladders, ropes or scaffolds, but can occasionally climb ramps and stairs. [She] can balance, bend, stoop, crouch, crawl and kneel occasionally. With regard to manipulative tasks, [she] can reach overhead occasionally. [She] can reach in all other directions, handle, finger and feel frequently. [She] has no limitation on her ability to see, speak or hear. [She] should avoid work at unprotected heights. [She] should work in a temperature controlled work environment.

Tr. 13.

The ALJ summarized Drury's testimony at the hearing:

[T]he claimant testified that she became unable to work on January 17, 2013. She stated that, on this day, she began taking Duloxetine for her fibromyalgia. She stated that she was having pain in her neck, fatigue and soreness all over. She stated that she was so fatigued while driving home from work that she was afraid that she would fall asleep while driving. She stated that she has not looked for work because she has many days where she does not feel well. She testified that she sees her primary care physician about every three months, who treats her for arthritis, endometriosis, body pain, a heart condition (she stated that she had a heart attack at age 35 and three stents placed), pre-diabetes,

asthma, allergies and sleep apnea. She testified that she is unable to use a CPAP machine because it exacerbates her migraine headaches. She further testified that she has migraines about once a week and severe migraines once a month. She stated that she takes numerous medications. She stated that Flexeril is helpful, but causes many side effects and she is not able to do much. She indicated that she takes it at least once a week. In addition, she stated that she takes Methotrexate. She testified that medication side effects include drowsiness and memory difficulties.

The claimant testified that the main problem that prevents her from working is all-over pain. She stated that the pain is there all the time and is worsened with activity such as moving, lifting and repetitive movements. She stated that she feels pain with lifting more than five pounds. She stated that she has trouble lifting a gallon of milk as she starts to shake. She stated that she can sit for 15 to 20 minutes, but then needs to stretch her back. She testified that she has not injured her back. She testified that she can stand for three minutes before having hip pain. She stated, at this time, she shifts to her other leg and can then stand for 10 minutes. She testified that she can walk for around 10 minutes. She testified that she would need to take a break if she was walking the length of a football field, as she would have leg pain due to her arthritis. She stated that she has not been referred to an orthopedist. She stated that she uses heat on her painful areas and stretches. She indicated that she has not been able to have physical therapy in the last three years.

Tr. 14.

The ALJ summarized Drury's testimony about her daily activities:

As to her daily activities, she stated that she wakes up, stretches, watches the news and has breakfast. She then stated that she is an Uber driver and drives a customer to work (a five-minute drive). After that, she stated that she uses heat on her back, takes a short nap, does housework in five-minute intervals and watches shows on television (with her feet up). She stated that she is able to wash laundry, load the dishwasher and do some food preparation. She stated that she cannot mop, but can spot vacuum. She testified that she drives each day, including her daily morning customer. She stated that if she feels well, she drives an afternoon customer to work that is around a ten-minute drive. She testified that a 40-minute trip was too long for her. As such, [she] stated that she stays closer to home and indicated that she gives about 10 Uber rides a week. She stated that she does about one in the

6

> morning and one or two in the afternoon. She stated that her mother lives next door and visits often. In addition, she stated that she can grocery shop on a good day, but if she is going on a larger trip, her husband accompanies her.

Tr. 15.

The ALJ observed Drury's Uber tax summary shows she drove 66 trip miles in April 2016, 408 trip miles in May 2016, 450 trip miles in June 2016, 580 trip miles in July 2016, 956 trip miles in August 2016, 393 trip miles in September 2016, and 456 trip miles in October 2016. Tr. 15.

The ALJ noted Drury's husband provided a statement indicating he helps Drury with household cleaning, cooking, driving, dressing, and remembering. Tr. 15. The ALJ noted Drury's husband indicated Drury's main complaints are "pain, headaches and fatigue." Tr. 15. The ALJ noted Drury's husband indicated "on good days, [Drury can] drive to the store for light shopping," Drury has "two to three bad days a week, during which she [sleeps]," and Drury cannot live alone because she would be unable "to facilitate arrangements to the hospital." Tr. 15.

The ALJ found Drury's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record" and that they affected Drury's "ability to work only to the extent they can reasonably be accepted as consistent with the objective medical and other evidence." Tr. 15.

The ALJ summarized the medical evidence, including records from treating physician Sanjiv Kapil, M.D., Tr. 15–18; treating physician Hina Azmat, M.D., Tr. 16–18; Allergy and Asthma Consultants of Central Florida, Tr. 16; CORA Rehabilitation, Tr. 18; Central Florida Heart Associates, Tr. 18–19; Central Florida Pulmonary Consultants, Tr. 18–19; University of Michigan Endocrinology Clinic, Tr. 19; and independent medical examiner James Shea, M.D., Tr. 19–20.

After summarizing the medical evidence, the ALJ found:

7

[T]he evidence … does not establish that the claimant's impairments are disabling in nature or prevent her from performing work in accordance with the assessed [RFC].

The claimant may have some inflammatory polyart[hr]opathy, but her symptoms are fairly well managed on her prescribed therapy and the functional capacity evaluation noted that she could perform a reduced range of light work.

Examinations with her primary care provider have shown no limitation of motion or joint swelling[,] and examinations with Dr. Kapil have shown only some tenderness. Nothing in the record suggests that she could not function within the ordinary and customary breaks afforded by most employers.

Although the claimant complained of weekly headaches and severe monthly headaches, the record contains little complaints of or treatment for these migraine headaches, outside of some prescription medication from Dr. Kapil.

Treatment notes indicate that she was diagnosed with diabetes, but this has been without complication.

She has obtained treatment for allergic rhinitis, but has not been back to see her allergist in quite some time. Her pulmonary function testing was normal. Pulmonol[o]gy treatment records show that her respiratory issues were well controlled. She did not require[] any emergent treatment, hospitalizations or steroid treatment. She appears to get satisfactory results from her CPAP therapy when she is compliant with using it, which is not always the case.

She had some cardiac stenting over 10 years ago, but echocardiograms and other cardiac assessments since have been benign. Current treatment records document that she denied having any cardiac symptoms.

She testified that she has "pain all over her body" but this is inconsistent with a diagnosis of fibromyalgia. She has not been noted to have problems with ambulation or use of her hands based on Drs. Azmat's and Kapil's treatment notes or the functional capacity evaluation. Review of Dr. Kapil's and Azmat's examinations fail to demonstrate any ongoing edema in her upper or lower extremities, synovitis or any joint swelling.

In addition, her daily activities … are consistent with the ability to work within the assessed [RFC]. She works as an Uber driver, has been able to travel to Alabama and Michigan (more than once) and was able to visit Universal and stand in line. She is able to grocery shop alone for short trips and perform housework in intervals. In addition, the record, as detailed above, contains several notations that she was walking for exercise. Thus, the undersigned finds that the claimant's allegations are not consistent with the totality of the objective evidence of record.

Tr. 20 (some paragraph spacing added).

On the medical opinions, the ALJ found:

As for the opinion evidence, the State agency medical consultant opined that the claimant could perform light work with postural and environmental limitations (Exhibits 6A and 7A). The undersigned accords some weight to this opinion to the extent [it] is consistent with the assessed [RFC]. This opinion is generally consistent with the benign examination findings of Drs. Kapil and Azmat, as well as the claimant's daily activities. However, in light of the functional capacity evaluation, the undersigned finds that the claimant should be limited to lifting 15 pounds occasionally and have the opportunity to change position at will every 15 to 30 minutes.

The recent assessment by Dr. Shea, a physiatrist, is afforded little weight, as it is internally inconsistent and, as discussed previously, there is no evidence to support a diagnosis of fibromyalgia. Further, Dr. Shea's assessment is not consistent with the examination findings of Dr. Kapil, a treating rheumatologist, the claimant's daily activities or the claimant's good response to her prescribed therapy.

Partial weight is accord[ed] to the functional capacity evaluation performed in 2014 (Exhibit 21F). The recommendations that the claimant needs to walk for up to five minutes every 20 minutes and needs a flexible 4[-] to 8[-]hour workday because pain and fatigue may interfere with work duties are not supported by any examination finding.

Tr. 21 (some paragraph spacing added).

At step four, the ALJ found Drury can perform no past relevant work, which the ALJ identified as account information clerk, child monitor, administrative clerk, cook, and account clerk. Tr. 21.

At step five, the ALJ considered Drury's age, education, work experience, and RFC and found there are jobs in significant numbers in the national economy she can perform. Tr. 22. The ALJ identified addresser, surveillance system monitor, and table worker. Tr. 22–23.

The ALJ thus found Drury not disabled from January 17, 2013, to March 9, 2017. Tr. 23.

## V.    Standards

A court reviews the Commissioner's factual findings for substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "less than a preponderance"; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). The court may not decide facts anew, reweigh evidence, make credibility determinations, or substitute its judgment for the Commissioner's judgment. *Id.* If substantial evidence supports an ALJ's decision, a court must affirm, even if other evidence preponderates against the factual findings. *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).

"This restrictive standard of review applies only to findings of fact," and "no similar presumption of validity attaches to the [Commissioner's] conclusions of law, including determination of the proper standard to be applied in reviewing claims." *Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991) (quoted authority omitted). "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009).

## VI.    Law & Analysis

### A.    *Drury's First Argument (Doc. 15 at 14–22)*

Drury first argues the ALJ failed to apply the correct legal standards to medical opinions. Doc. 15 at 14–22.

Regardless of its source, the SSA "will evaluate every medical opinion" it receives. 20 C.F.R. § 404.1527(c) (2012). "Medical opinions are statements from acceptable medical sources[6] that reflect judgments about the nature and severity of … impairment(s), including … symptoms, diagnosis and prognosis, what [one] can still do despite impairment(s), and … physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2) (2012).

The SSA generally will give more weight to the medical opinions of "treating sources" because they "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations."[7] 20 C.F.R. § 404.1527(c)(2) (2012). Unless the SSA gives a treating source's opinion controlling weight, it will consider several factors to decide the weight to give a medical opinion: examining relationship, treatment relationship, supportability,

---

[6]An "acceptable medical source" is a licensed physician (a medical or osteopathic doctor), licensed or certified psychologist, licensed optometrist, licensed podiatrist, or qualified speech-language pathologist. 20 C.F.R. § 404.1513(a) (2011). An ALJ may also consider evidence from other sources not listed as acceptable medical sources, including nurse practitioners, therapists, social welfare personnel, and friends. 20 C.F.R. § 404.1513(d) (2011). That evidence may show the severity of an impairment and how it affects a claimant's ability to work, but cannot establish the existence of a medically determinable impairment or constitute a "medical opinion" under the regulations. Social Security Ruling ("SSR") 06-03p, 2006 WL 2263437 (Aug. 9, 2006) (rescinded effective March 27, 2017). Opinions from other sources "are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." Id. The record "should reflect the consideration of opinions" from other sources, and the ALJ should explain the weight given to them "or otherwise ensure that the discussion of the evidence … allows a claimant or subsequent reviewer to follow [his] reasoning, when such opinions may have an effect on the outcome of the case." Id.

[7]A "treating source" is a physician, psychologist, or other acceptable medical source who provides medical treatment or evaluation to the claimant and who has, or has had, an ongoing treatment relationship with the claimant, as established by medical evidence showing that the claimant sees or has seen the physician with a frequency consistent with accepted medical practice for the treatment or evaluation required for the medical condition. 20 C.F.R. § 404.1527(a)(2).

consistency, specialization, and any other relevant factor. 20 C.F.R. § 404.1527(c) (2012). An ALJ need not explicitly address each factor. *Lawton v. Comm'r of Soc. Sec.*, 431 F. App'x 830, 833 (11th Cir. 2011).

An ALJ need not give more weight to a treating source's opinion if there is good cause to do otherwise and substantial evidence supports the good cause. *Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2004). Good cause exists if the evidence does not bolster the opinion, the evidence supports a contrary finding, or the opinion is conclusory or inconsistent with the treating source's own medical records. *Id.* at 1240−41. "The law is clear that, although the opinion of an examining physician is generally entitled to more weight than the opinion of a non-examining physician, the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985).

An ALJ "must state with particularity the weight given to different medical opinions and the reasons therefor." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011). An ALJ's failure to do so is reversible error unless harmless. *Caldwell v. Barnhart*, 261 F. App'x 188, 190 (11th Cir. 2008) (*citing Diorio v. Heckler,* 721 F.2d 726, 728 (11th Cir.1983)). Failure to state the weight given to an opinion is harmless if the opinion is consistent with the decision and the decision is in-depth, shows thoughtful consideration of the findings, and does not leave the court wondering how the ALJ reached his decision. *Colon v. Colvin*, 660 F. App'x 867, 870 (11th Cir. 2016); *see also East v. Barnhart*, 197 F. App'x 899, 901 n.3 (11th Cir. 2006) (any error in failing to explicitly address consulting psychologist's report was harmless because observations in report were consistent with ALJ's determination).

An ALJ's finding may be implicit if the "implication [is] obvious." *Tieniber v. Heckler*, 720 F.2d 1251, 1255 (11th Cir. 1983).

For her argument the ALJ failed to apply the correct legal standards to medical opinions, Drury first points to opinions in the evaluation from Cora Rehabilitation

Clinic and Dr. Azmat's concurrence with the evaluation. Doc. 15 at 14–17. The evaluation was done in October 2014 by Jaime Sigurdsson, a certified ergonomic assessment specialist. Tr. 699–725. Dr. Azmat was Drury's primary care physician, with treatment records beginning in October 2012. Tr. 443–517, 538–42, 727–93, 1042–46.

Sigurdsson's evaluation included tests and resulted in findings in these main categories: "Lifting Ability Summary," "Functional Restrictions & Limitations," "Recommendations & Accommodations," "Patient Demographics," "Employment Information," "Diagnosis, History & Mechanism of Injury," "Sincerity of Effort," "Job Demand Analysis," "Material Handling," "Non-Material Handling," "Sit/Stand Tolerance," "Cardiovascular Status," "Single Stage Treadmill Test," "Musculoskeletal Assessment," and "Disability Questionnaire."[8] Tr. 699–725.

Under "Lifting Ability Summary," Sigurdsson opined Drury can perform light work. Tr. 699. Under "Functional Restrictions & Limitations," Sigurdsson listed: "Limited cervical rotation to occasional; driving < 2 hours/day," "Walking, balancing, kneeling, crawling, bending, squatting, climbing, and reaching limited to occasional," "Standing and sitting limited to frequent," and "No lifting/carrying > 15 lbs." Tr. 699. Under "Recommendations & Accommodations," Sigurdsson opined Drury would need accommodations: "1) Be able to change positions at will (cannot tolerate sitting and or standing > 15-20 min intervals[)]. 2) Walk for up to 5 min every 20 min. 3) Be able to have flexible work days as pain and fatigue may interfere with work duties and therefore client would work better with a job that can accom[m]odate work flexibility from 4–8 hours/day." Tr. 699. In treatment notes dated February 5, 2015, Dr. Azmat

---

[8]The evaluation used tests to measure grip rate, which was normal, Tr. 702–08; questionnaires to assess pain, which was "3/10" before and "5/10" after the evaluation, with no exaggerated response, Tr. 709–13; tests to perform a musculoskeletal assessment, Tr. 722–23; and tests to perform a job-demand analysis, Tr. 714–21.

states, "I have looked at the physical therapy evaluation … and concur with their evaluation." Tr. 729.

In giving "some weight" to the opinions of Dr. Molis (the state agency medical consultant), the ALJ explained the opinions were generally consistent with Dr. Azmat's and Dr. Kapil's "benign examination findings" and Drury's daily activities, but, in view of Sigurdsson's evaluation, greater limitations were necessary (lifting 15 pounds only occasionally and having the opportunity to change position at will every 15 to 30 minutes).[9] Tr. 21. In giving "partial weight" to Sigurdsson's evaluation, the ALJ explained two of the suggested accommodations (needing to walk up to 5 minutes every 20 minutes and needing a flexible 4-to-8-hour workday) "are not supported by any examination finding." Tr. 21.

Drury focuses on that reason and the ALJ's failure to explicitly state the weight given to Dr. Azmat's concurrence with the evaluation. Doc. 15 at 14–17. Drury contends the ALJ's "one single reason" for rejecting the two suggested accommodations from Sigurdsson's evaluation is "vague and insufficient" because "many examinations supported the limitations in the evaluation." Doc. 15 at 17.

Drury shows no reversible error. The ALJ explicitly stated the weight given to Sigurdsson's evaluation ("partial weight," Tr. 21) and the reason for rejecting some of the evaluation (two suggested accommodations "are not supported by any examination finding," Tr. 21), and thereby implicitly stated and explained the weight given to Dr. Azmat's concurrence with the evaluation. *See Winschel*, 631 F.3d at 1179; *Tieniber*, 720 F.2d at 1255. The ALJ's reason—the absence of an examination finding

---

[9]Sigurdsson suggested a "No lifting/carrying > 15 lbs" limitation, Tr. 699, while the ALJ found a slightly different "15 pounds occasionally" limitation. Tr. 13. Drury does not focus on this variance, perhaps because the jobs the ALJ found she can perform are "sedentary" and therefore require lifting no more than 10 pounds at a time. *See* 20 C.F.R. § 404.1567(a) (2012).

to support the two suggested accommodations—constitutes good cause. *See Phillips, 357 F.3d at 1240*.

Substantial evidence ("such relevant evidence as a reasonable person would accept as adequate to support a conclusion") supports the ALJ's reason. *See Moore, 405 F.3d at 1211* (quoted). Neither the evaluation nor medical records discuss examinations for a need to walk up to 5 minutes every 20 minutes or work a flexible 4-to-8-hour workday.[10] *See generally* Tr. 699 (evaluation); Tr. 443–517, 538–42, 727–93, 1042–46 (Dr. Azmat's examinations); Tr. 48, 395–442, 518–31, 551–62, 726 (Dr. Kapil's examinations). Drury points to examination findings that support she had pain, abdominal and finger abnormalities, adrenal adenomas, and colon inflammation, Doc. 15 at 14–15, and further points to indices (questionnaires) completed during Sigurdsson's evaluation, Doc. 15 at 17, but fails to explain how these general findings and questionnaires support specific accommodations that would provide her opportunities to walk up to 5 minutes every 20 minutes and work flexible 4-to-8-hour workdays.

For her argument the ALJ failed to apply the correct legal standards to medical opinions, Drury next points to medical records of Dr. Kapil. Doc. 15 at 17–19. Dr. Kapil was Drury's treating rheumatologist beginning in October 2012 based on a referral from Dr. Azmat to determine if she had a rheumatologic condition. Tr. 48, 395–442, 518–31, 551–62, 726.

At Drury's first visit on October 31, 2012, Dr. Kapil summarized Drury's complaints, background, and history, and found normal conditions except a mild skin

---

[10]For Sigurdsson's evaluation, one test assessed Drury's "demonstrated ability" to walk as "occasional." Tr. 717. An analysis reported she walked in "10 min intervals 2x hour," Tr. 717; a comment provided, "Client performed the treadmill test at 2.0 5% for 5 min and then walked on flat surface for 3 min before terminating test due to hip pain and LBP," Tr. 717; and another comment provided, "Mrs. Drury was able to perform the single stage treadmill test and produced a test result of 6.54 METS, which falls within the energy requirement for a Heavy PDC," Tr. 721.

rash; positive tender points; and tenderness at her neck, shoulders, lower back, right-hand proximal interphalangeal ("PIP") (finger) joints, left-hand metacarpophalangeal ("MCP") joints (second and third fingers), knees, and ankles. Tr. 438.

At Drury's next visit on December 5, 2012, Dr. Kapil found normal conditions, including no tenderness in Drury's trochanteric (hip) region, except tenderness at her neck, shoulders, lower back, elbows, wrists, "I" carpometacarpal ("CMC") (wrist) joints, PIP (finger) joints, MCP (finger) joints, distal interphalangeal ("DIP") (finger) joints, knees, ankles, and metatarsophalangeal ("MTP") (toe) joints. Tr. 433.

Dr. Kapil's records of examinations of Drury over the next two years included similar notes: **February 15, 2013** (positive tender points; tenderness at her neck, shoulders, lower back, wrists, DIPs, PIPS, MCPs, trochanteric region, knees, and ankles), Tr. 428; **April 26, 2013** (positive tender points; tenderness at her neck, shoulders, lower back, elbows, DIPs, PIPS, MCPs, trochanteric region, knees, ankles, and MTPs), Tr. 423; **June 12, 2013** (tenderness at her neck, shoulders, lower back, elbows, I CMCs, DIPs, PIPS, MCPs, trochanteric region, knees, and ankles), Tr. 418; **August 15, 2013** (tenderness at her neck, shoulders, lower back, elbows, wrists, PIPS, MCPs, trochanteric region, knees, and ankles, but no tenderness at her DIPs or I CMCs; decreased range of motion in her neck and back), Tr. 413; **October 15, 2013** (tenderness at her neck, shoulders, lower back, I CMCs, PIPS, MCPs, knees, ankles, and MTPs), Tr. 408; **December 10, 2013** (same), Tr. 403; **February 25, 2014** (same), Tr. 398; **May 6, 2014** (same), Tr. 524; **July 10, 2014** (same), Tr. 520; **December 2, 2014** (exam not reported), Tr. 551; and **February 17, 2015** (exam not reported), Tr. 555.

Nurse Practitioner Theresa Zimmer saw Drury at the same office where Dr. Kapil works on **June 9, 2015**, Tr. 557–59; **August 25, 2015**, Tr. 560–62, 690–92; **April 21, 2016**, Tr. 584; **May 19, 2016**, Tr. 580–83; and **September 20, 2016**, Tr. 598–600. During those visits, Nurse Zimmer recorded Drury's reports of pain

throughout her body and musculoskeletal tenderness similar to that noted by Dr. Kapil.

A note from the February 17, 2015, examination with Dr. Kapil provides, "Patient was again recommended a second opinion at Shands, for fibromyalgia vs seronegative inflammatory arthritis as she does feel better with DMARDs and Medrol PRN." Tr. 555. The administrative record does not include records from Shands. *See generally* Tr. 280–1046. There are other mentions of Shands in the administrative record, indicating Drury saw an endocrinologist at Shands in June 2015 for Addison's disease; Drury later went to Shands for a rheumatology workup; Drury later sought another opinion from the University of Michigan, where she obtained diagnoses of adrenal adenoma, secondary adrenal insufficiency, and fatigue; and Drury had worsening pain when Shands stopped Cyclosporine and Methotrexate. Tr. 558, 561, 569, 577, 580, 582, 584, 691, 1033. Notes from the May 19, 2016, visit with Nurse Zimmer provide, "Patient was advised we believe she has a seronegative inflammatory arthritis" based on clinical findings and restarted Drury on Methotrexate. Tr. 582.

On October 16, 2014, Drury's lawyer sent the results of Sigurdsson's October 7, 2014, evaluation to Dr. Kapil to "review and indicate whether [she] agree[d] or disagree[d] with the results and limitations of Ms. Drury." Tr. 726. Dr. Kapil responded, "I am not trained to assess disability. I will defer to IME [independent medical evaluation] for evaluation." Tr. 726. The evaluation ultimately was done by Dr. Shea in December 2016, more than two years after Sigurdsson's evaluation. Tr. 1032–41.

Drury correctly observes the ALJ did not explicitly state any weight given to "Dr. Kapil's opinion." Doc. 15 at 19. Drury appears to reference Dr. Kapil's statement he defers to the independent medical evaluation because he is not trained to assess disability. Doc. 15 at 19.

Drury shows no reversible error. Dr. Kapil's statement is not a medical opinion because it was given before the independent medical evaluation and, as a deferral to a yet-to-be-completed evaluation, does not "reflect judgments about the nature and severity of … impairment(s), including … symptoms, diagnosis and prognosis, what [one] can still do despite impairment(s), and … physical or mental restrictions." *See* 20 C.F.R. § 404.1527(a)(2) (2012) (quoted). To the extent Drury references general examination findings by Dr. Kapil, the ALJ implicitly accepted them by describing them as "benign," Tr. 21, finding them generally consistent with Dr. Molis's opinions, and including limitations in the RFC greater than those assessed by Dr. Molis. *Compare* Tr. 13 *with* Tr. 98–99. To the extent there was error, Drury has not shown how it was harmful.

Finally, for her argument the ALJ failed to apply the correct legal standards to medical opinions, Drury points to medical opinions of Dr. Shea in the independent medical examination. Doc. 15 at 17–22.

In the independent medical examination, Dr. Shea summarized Drury's complaints, background, and history (including the results of Sigurdsson's evaluation). Tr. 1032–35. He noted complaints of ongoing headaches (which made her "unable to perform any cognitive functional activities" and caused "8 days a month of absence from work on a nonpredictable basis"); twelve-year history of neck pain; "serious and disabling" polyinflammatory arthritis (in her elbows, wrists, fingers, hips, and ankles, but not her knees), which had led to Cushing's Syndrome "as a side effect of the chronic steroids previously prescribed to control her arthritis"; "fairly well controlled" asthma; and sleep apnea. Tr. 1034. He also noted a reported medical history of fibromyalgia and other ailments. Tr. 1034.

Through a physical examination, Dr. Shea found Drury had a degraded range of motion in her neck, with "[m]arked tenderness to palpation over the right rhomboids. Moderate tenderness to palpation over the cervical paraspinals, trapezius muscles and left rhomboids. Non-tender to palpation over the greater occipital nerves,

supraspinous ligament, and spinous processes." Tr. 1036. For her upper extremities, Dr. Shea found "active synovial thickening over the dorsal MCP joints of both hands. Motor exam revealed generalized weakness of both upper extremities, mostly 4/5 to 4-/5. There was no inappropriate give[]way weakness. The only give way weakness was with right elbow flexion and it was related to right wrist pain which clinically fits her inflamed joint disease picture." Tr. 1036. For her back, Dr. Shea found "[c]omplete straightening of the cervical lordosis" and an across-the-board degraded lumbar range of motion. Tr. 1036. For her lower extremities, Dr. Shea found "[m]oderately severe bilateral trochanteric bursae tenderness" and "[m]ild to at most moderate iliotibial band tenderness." Tr. 1036.

Dr. Shea diagnosed Drury with migraine headaches, inflammatory polyarthropathy involving multiple joints, bilateral trochanteric bursitis, fibromyalgia, sleep apnea, sleep deprivation secondary to sleep apnea, and chronic pain. Tr. 1037. Dr. Shea opined:

> [T]he combination of her medical problems interferes with her ability to maintain gainful employment. She has significant impairment in cognitive function and focus secondary to sleep deprivation. Migraine headaches and flare-ups of arthritic inflammation will make absences unpredictable as well as frequent. Synovial inflammation of her hands will affect her fine motor movement. Bilateral trochanteric bursitis and arthritic involvement of her ankles and feet affect her ability to stand or walk for prolonged periods.

Tr. 1037.

In a medical statement for Drury's disability claim, Dr. Shea noted inflammation in Drury's hands, wrists, ankles, feet, and spine. Tr. 1038. Dr. Shea noted Drury had significant fatigue and malaise; a periodic need for help in daily living; and moderate limitations in social functioning and completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace. Tr. 1039. Dr. Shea opined Drury occasionally could bend and stoop, raise her arms over shoulder level, and manipulate her hands (both gross and fine manipulation). Tr. 1040. Dr.

Shea opined Drury could not lift on a frequent basis but could lift five pounds occasionally. Tr. 1040. Dr. Shea opined Drury could stand for fifteen minutes at one time. Tr. 1040. Dr. Shea's note on her ability to sit is partly illegible: "Much less than the 15 min for standing [illegible] about 2-3 minutes due to lateral hip pain and bilateral ankle/foot pain." Tr. 1040. Dr. Shea did not state how many hours Drury could work each day. Tr. 1040. In a "comments" section, Dr. Shea stated:

> [Drury] has significant impairments in cognitive function and focus second to sleep deprivation. This is a combination of her multiple areas of pain and the sleep apnea which cannot be managed with a CPAP machine. Her pain and excessive daytime drowsiness interferes [sic] with her function on a [illegible] basis. She also has [illegible] migraines only minimally responsive to Imitrex and the [illegible] of Topamax. The clinical picture of her arthritis is [illegible] enough that her board certified rheumatologist is managing her with [M]ethotrexate. She cannot take steroids [illegible] of the development of Cushing's Syndrome. Therefore her pain is worse than it might otherwise have been. Her involvement of her ankles along with the bilateral trochanteric bursitis prevents standing and walking. It's the full clinical picture that makes her unable to work.

Tr. 1040.

In giving "little weight" to Dr. Shea's opinions, the ALJ explained they were "internally inconsistent," inconsistent "with the examination findings of Dr. Kapil," and inconsistent with Drury's "daily activities or [her] good response to her prescribed therapy." Tr. 21.

Drury shows no reversible error. Substantial evidence supports that, despite the assessments of Dr. Shea, Tr. 1037–40: (1) Drury's "symptoms are fairly well managed on her prescribed therapy," Tr. 399 ("arthritis … feels controlled with her medications"), 401 ("less stiffness in neck with addition of Cyclosporine"), 599 ("less pains with restarting Methotrexate"); (2) she has few "complaints of or treatment for migraine headaches, outside of some prescription medication from Dr. Kapil," Tr. 400, 405, 410, 414, 419, 424, 429, 434, 439, 599–600; (3) "the functional capacity evaluation noted that she could perform a reduced range of light work," Tr. 699; and

(4) examinations "with her primary care provider have shown no limitation of motion or joint swelling," and "examinations with Dr. Kapil have shown only some tenderness. Nothing in the record suggests that she could not function within the ordinary and customary breaks afforded by most employers," Tr. 443–517, 538–42, 727–93, 1042–46 (Dr. Azmat's examinations); Tr. 48, 395–442, 518–31, 551–62, 726 (Dr. Kapil's examinations).

Substantial evidence also supports that Drury's daily activities "are consistent with the ability to work within the assessed" RFC despite Dr. Shea's opinion to the contrary because she: (1) "works as an Uber driver," Tr. 63–64, 193–99; (2) has been "able to travel to Alabama and Michigan (more than once) and was able to visit Universal and stand in line," Tr. 523, 610; (3) is "able to grocery shop alone for short trips and perform housework in intervals," Tr. 61, 65, 1034; and (4) was "walking for exercise," Tr. 645, 649, 655, 660.

Drury argues the ALJ mischaracterized her daily activities, explaining her work as an Uber driver is part-time, her travel was brief and for medical treatment, her grocery shopping does not take long, she has trouble doing housework and has to frequently rest, and her walking is brief (and resulted in an injury). Doc. 15 at 21. Although the ALJ could have viewed the activities differently and in Drury's favor, the Court may not reweigh evidence or substitute its judgment for the ALJ's judgment. *See Moore,* 405 F.3d at 1211. It suffices that, when viewed together, the activities constitute substantial evidence to support the finding they are consistent with the ability to work within the RFC. *See id.*

To the extent the ALJ failed to explain how Dr. Shea's evaluation was "internally inconsistent," any error is harmless. Because of the other evidence supporting the ALJ's reasons for giving "little weight" to the evaluation, Drury has not shown that failing to explain internal inconsistencies would have led the ALJ to contradict his "ultimate findings" about the evaluation. *See Caldwell,* 261 F. App'x at 190 (quoted).

With no showing the ALJ failed to correctly apply the law or follow the procedures, and with substantial evidence to support the underlying factual findings, remand to reconsider the medical opinions is unwarranted. This conclusion does not change "even if other evidence preponderates against the factual findings." *See Martin*, 894 F.2d at 1529 (11th Cir. 1990) (quoted).

## B.    *Drury's Second Argument (Doc. 15 at 22–25)*

Drury next argues the ALJ erred by failing to apply the correct legal standards in rejecting her fibromyalgia impairment and resulting limitations. Doc. 15 at 22–25.

At step two of the sequential evaluation process, an ALJ considers whether a claimant has a severe impairment or combination of impairments. 20 C.F.R. § 404.1520(a)(4)(ii) (2012). A "severe" impairment significantly limits a claimant's ability to do basic work activities. *See* 20 C.F.R. § 404.1521(a) (2012) (defining "non-severe impairment").

"Step two is a threshold inquiry." *McDaniel v. Bowen*, 800 F.2d 1026, 1031 (11th Cir. 1986). It is "a reasonable administrative convenience designed to screen out groundless claims." *Stratton v. Bowen*, 827 F.2d 1447, 1452 (11th Cir. 1987). It "acts as a filter" to eliminate claims involving no substantial impairment. *Jamison v. Bowen*, 814 F.2d 585, 588 (11th Cir. 1987).

A finding of any severe impairment satisfies step two. *Id.* Thus, an ALJ need not identify every severe impairment at step two. *Tuggerson-Brown v. Comm'r of Soc. Sec.*, 572 F. App'x 949, 951 (11th Cir. 2014); *Delia v. Comm'r of Soc. Sec.*, 433 F. App'x 885, 887 (11th Cir. 2011). Still, he must demonstrate he considered the claimant's impairments—severe and non-severe—in combination at step three and in assessing the RFC. *Heatly v. Comm'r of Soc. Sec.*, 382 F. App'x 823, 825 (11th Cir. 2010).

Social Security Ruling ("SSR") 12-2p (2012) addresses fibromyalgia. The SSA may find a person has fibromyalgia if medical evidence from an acceptable medical

source shows a diagnosis that "is not inconsistent with the other evidence in the person's case record" and the evidence meets at least one of "two sets of criteria for diagnosing [it]." SSR 12-2p, 2012 WL 3104869, at *2.

The first set of criteria, based on the 1990 American College of Rheumatology ("ACR") Criteria for the Classification of Fibromyalgia, requires:

> 1. A history of widespread pain—that is, pain in all quadrants of the body (the right and left sides of the body, both above and below the waist) and axial skeletal pain (the cervical spine, anterior chest, thoracic spine, or low back)—that has persisted (or that persisted) for at least 3 months. The pain may fluctuate in intensity and may not always be present.
>
> 2. At least 11 positive tender points on physical examination (see diagram below). The positive tender points must be found bilaterally (on the left and right sides of the body) and both above and below the waist.
>
> [and] …
>
> 3. Evidence that other disorders that could cause the symptoms or signs were excluded. Other physical and mental disorders may have symptoms or signs that are the same or similar to those resulting from [fibromyalgia]. Therefore, it is common in cases involving [fibromyalgia] to find evidence of examinations and testing that rule out other disorders that could account for the person's symptoms and signs. Laboratory testing may include imaging and other laboratory tests (for example, complete blood counts, erythrocyte sedimentation rate, antinuclear antibody, thyroid function, and rheumatoid factor).

SSR 12-2p, 2012 WL 3104869, at *2–3 (Section II.A).

The second set of criteria, based on the 2010 ACR Preliminary Diagnostic Criteria, requires:

> 1. A history of widespread pain;
>
> 2. Repeated manifestations of six or more [fibromyalgia] symptoms, signs, or co-occurring conditions, especially manifestations of fatigue, cognitive or memory problems ("fibro fog"), waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome; and

23

3. Evidence that other disorders that could cause these repeated manifestations of symptoms, signs, or co-occurring conditions were excluded (see section II.A.3).

SSR 12-2p, 2012 WL 3104869, at *3. The SSA emphasizes, "we need objective medical evidence to establish the presence of" fibromyalgia. *Id.*

The Eleventh Circuit recognizes that, "[g]iven the nature of fibromyalgia, a claimant's subjective complaints of pain are often the only means of determining the severity of a patient's condition and the functional limitations caused thereby." *Somogy v. Comm'r of Soc. Sec.*, 366 F. App'x 56, 64 (11th Cir. 2010) (citing *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005) (per curiam)). Fibromyalgia "often lacks medical or laboratory signs," "is generally diagnosed mostly on an individual's described symptoms," and its "hallmark" is "a lack of objective evidence." *Id.* "The lack of objective clinical findings is, at least in the case of fibromyalgia, therefore insufficient alone to support an ALJ's rejection of a treating physician's opinion as to the claimant's functional limitations." *Id.*

For her argument the ALJ erred by failing to apply the correct legal standards in rejecting her fibromyalgia impairment and resulting limitations, Drury correctly observes the ALJ failed to consider both sets of criteria under SSR 12-2p, instead focusing only on the 1990 ACR criteria. Doc. 15 at 23; *see* Tr. 12–13.

On the first criterion ("history of widespread pain"), the ALJ found a lack of evidence[11] in the treatment notes of Dr. Azmat, Dr. Kapil, and Sigurdsson's

---

[11]Drury contends it is "bizarre" that the ALJ found Drury's reported "pain all over her body" "inconsistent with a diagnosis of fibromyalgia," Tr. 20, while also finding she had "no history of widespread pain in all quadrants of the body," Tr. 13, as a reason "to reject fibromyalgia." Doc. 15 at 24. She cites contrary evidence in her hearing testimony (Tr. 14, 46, 54–59), objective examinations documenting joint pain (Tr. 18–19, 398, 403, 408, 413, 418, 423, 428, 433, 438, 520, 524, 551), examinations by Dr. Kapil noting "pains in many parts of the body" (Tr. 431, 523), examinations by Dr. Azmat noting "tender points" (Tr. 480), and Nurse Zimmer's noting of "pains throughout the body" (Tr. 580, 598). Doc. 15 at 23. The Commissioner does not expressly defend the ALJ's finding on this criterion, focusing on Drury's failure to satisfy the other criteria. Doc. 20 at 13.

evaluation that Drury had "problems with ambulation or use of her hands" and "any ongoing edema in her upper or lower extremities, synovitis or any joint swelling." Tr. 20. On the second criterion, the ALJ found insufficient evidence to support "[a]t least 11 positive tender points on physical examination … found bilaterally (on the left and right sides of the body) and both above and below the waist."[12] Tr. 13; SSR 12-2p. On the third criterion ("other disorders … were excluded"), the ALJ found no "evidence that other disorders that could cause the alleged symptoms were excluded." Tr. 13.

The third criterion is substantially the same in both sets of criteria under SSR 12-2p. *Compare* SSR 12-2p, 2012 WL 3104869, at *2–3 ("Evidence that other disorders that could cause the symptoms or signs were excluded.") *with id.* at *3 ("Evidence that other disorders that could cause these repeated manifestations of symptoms, signs, or co-occurring conditions were excluded.").

Drury contends she satisfied the third criterion because she "underwent laboratory testing, imaging studies, and tried various medications before being diagnosed." Doc. 15 at 24. She observes her fibromyalgia diagnosis came with Dr. Shea's diagnosis of inflammatory polyarthropathy (Tr. 1037), the Central Florida Heart Associate's diagnoses of myalgia, myositis, and musculoskeletal/connective tissue disease (Tr. 545–49, 587–91), and Nurse Zimmer's diagnosis of inflammatory polyarthropathy (Tr. 577, 598–99). Doc. 15 at 24. The Commissioner responds Drury fails to present "the types of testing necessary to rule out other disorders" under SSR

---

[12]The Commissioner correctly observes Drury "fails to argue—much less show— that such testing was performed and eleven positive tender points were established on examination." Doc. 20 at 13; *see generally* Doc. 15. Drury instead contends she meets the 2010 ACR requirement for "[r]epeated manifestations of six or more … symptoms, signs, or co-occurring conditions" because of repeated reports of "muscle pain, fatigue, headaches, numbness, nausea, chest pain, and rash." Doc. 15 at 23. Although the ALJ did not address this criterion, the Commissioner contends Drury's argument "lacks merit" because "treatment notes from the relative period frequently show she denied the presence of these symptoms." Doc. 20 at 13–14 (citing Tr. 477, 480, 508, 519, 523, 538, 545–46, 587–88, 727, 732, 736, 741, 747, 752, 757, 761, 765, 769, 773, 777, 846, 850–51, 917–18, 943, 1007, 1042).

12-2p, such as "imaging, … complete blood counts, erythrocyte sedimentation rate, anti-nuclear antibody, thyroid function, and rheumatoid factor." Doc. 20 at 13.

Substantial evidence, as explained by the Commissioner, Doc. 20 at 13, supports the ALJ's finding there was no evidence that other disorders that could cause the alleged symptoms were excluded. No medical records discuss taking any specific actions, such as conducting the tests described by the Commissioner, to determine if disorders other than fibromyalgia were excluded as causing her symptoms (or signs). Dr. Kapil's statement, "Patient was again recommended a second opinion at Shands, for fibromyalgia vs seronegative inflammatory arthritis as she does feel better with DMARDs and Medrol PRN," Tr. 555, the absence of Shands records, and Nurse Zimmer's statement following Shands visits, "Patient was advised we believe she has a seronegative inflammatory arthritis" based on clinical findings, Tr. 582, appear to indicate other disorders that could cause the alleged symptoms were not excluded. Without more, that other diagnoses accompanied the fibromyalgia diagnosis does not necessarily mean those disorders were excluded as the cause of the alleged symptoms. Because substantial evidence supports the ALJ's finding on the third criterion, and it is substantially the same in both sets of criteria, any error in failing to address both sets of criteria is harmless.

But even assuming error in failing to explicitly consider both sets of criteria, the error is harmless because the ALJ found other severe impairments at step two of the sequential evaluation process, Tr. 12, moved on to other steps, Tr. 13–23, and throughout considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," Tr. 13. *See Heatly*, 382 F. App'x at 825. In rejecting Drury's contention that pain made her unable to work or required limitations greater than those in the RFC, the ALJ focused on Drury's symptom management through medication and therapy, ability to be an Uber driver and perform activities of daily living (including traveling, shopping, and walking for exercise), and generally "benign" medical records of her

treating physicians, which constituted substantial evidence for the decision. *See generally* Tr. 20–21.

Again, with no showing the ALJ failed to correctly apply the law or follow the procedures, and with substantial evidence to support the underlying factual findings, remand to reconsider whether Drury has fibromyalgia is unwarranted. This conclusion does not change "even if other evidence preponderates against the factual findings." *See Martin*, 894 F.2d at 1529 (11th Cir. 1990) (quoted).

## VII. Recommendations[13]

The undersigned recommends:

(1)   **affirming** the Commissioner's decision;

(2)   **directing** the Clerk of Court to enter judgment for the Commissioner of Social Security and against Tara Madeline Drury affirming the Commissioner's decision under sentence four of 42 U.S.C. § 405(g); and

(3)   **directing** the Clerk of Court to close the file.

**Entered** in Jacksonville, Florida, on February 1, 2019.

PATRICIA D. BARKSDALE
*United States Magistrate Judge*

c:      Counsel of Record

---

[13]"Within 14 days after being served with a copy of [a report and recommendation on a dispositive motion], a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b)(2). "A party may respond to another party's objections within 14 days after being served with a copy." *Id*. A party's failure to serve and file specific objections to the proposed findings and recommendations alters the scope of review by the District Judge and the Eleventh Circuit, including waiver of the right to challenge anything to which no specific objection was made. *See* Fed. R. Civ. P. 72(b)(3); 28 U.S.C. § 636(b)(1)(B); 11th Cir. R. 3-1; Local Rule 6.02.